## STODDARD *v*. STATE.

### Opinion delivered October 26, 1925.

1. HOMICIDE—EVIDENCE OF THREATS.—To convey a threat, no particular words are necessary; any language being sufficient which shows, either on its face or in connection with the circumstances under which it was spoken or written and with the relations of the parties, though it consists merely of inuendoes and suggestions.

2. HOMICIDE—EVIDENCE OF THREAT.—In a prosecution for murder, a witness for the defense offered to testify that decedent asked witness whether defendant was afraid of him, to which witness replied that defendant was afraid that decedent would get the drop on him, to which decedent replied that he "would not get behind a tree to get no man," and that if he got defendant in the right kind of a crowd he was going to show what there was to him. *Held* admissible as tending to prove an implied threat and upon the disputed issue as to who was the aggressor in the combat.

3. HOMICIDE—EVIDENCE—EXCUSE OR JUSTIFICATION.—In a murder case evidence that the defendant's wife had informed him that deceased had made indecent proposals to her was properly excluded, both because it was hearsay and because the making of such proposals was no excuse or justification for the homicide.

4. WITNESS—IMPEACHMENT ON CROSS-EXAMINATION.—Where witnesses testified on direct examination that they knew deceased and knew that his reputation was good, the fact that they admitted on cross-examination that they had not heard his reputation discussed did not render their testimony incompetent, but merely went to its weight and credibility.

5. HOMICIDE—INSTRUCTION AS TO THREATS.—An instruction that communicated threats made by deceased against the defendant could be considered only in determining who was the aggressor was erroneous in excluding consideration of such threats in determining whether defendant acted under an honest belief that he was in danger of losing his own life or receiving great bodily injury at the time of the killing.

6. HOMICIDE—SELF-DEFENSE—INSTRUCTION.—In a prosecution for murder, defendant is entitled to an affirmative instruction that if the danger appeared to him, acting without fault or carelessness, to be so pressing and urgent that the killing was necessary, and he honestly so believed, he would be justified.

7. HOMICIDE—SELF DEFENSE—INSTRUCTION.—An instruction in a prosecution for murder that the killing would be justified "if the defendant believed there was a reasonably apparent necessity to kill to save himself" was properly refused, as there must have been on the defendant's part a belief, honestly entertained, that there was a real, and not an apparent, necessity for the killing.

Appeal from Lee Circuit Court; *E. D. Robertson,* Judge; reversed.

*W. J. Lanier, R. D. Smith* and *H. P. Smith,* for appellant.

*H. W. Applegate,* Attorney General, and *John L. Carter,* Assistant, for appellee.

McCULLOCH, C. J. Appellant was indicted by the grand jury of St. Francis County for the crime of murder in the first degree, alleged to have been committed by killing Arthur Hamilton, and on change of venue to Lee County there was a trial of the cause, which resulted in appellant's conviction of murder in the second degree.

The killing of Hamilton by appellant is undisputed, and it occurred in the daytime on a street in the town or village of Colt, in St. Francis County. There were many eye-witnesses—some who claimed to have seen the whole of the encounter, and others part of it. Both men were armed, and each emptied his pistol in firing at the other. The only conflict in the testimony is as to who was the aggressor. There had been ill feeling between the two men, and they met in Colt on the day the killing occurred, neither of them being a resident of the town.

Appellant was living on a farm a few miles distant from Colt, and Hamilton was living at Forrest City at that time, having returned after an absence from the State. Appellant came to town first, and claimed that he was there by appointment with a physician, who was to examine a boil on appellant's arm or shoulder which the physician had previously lanced. Hamilton came into town later in a buggy, and appellant at the time was standing near one of the stores. Hamilton alighted from his buggy and stood for a time talking with an acquaintance named Holt, and the two men walked along or across the street towards a bridge, when the firing began between appellant and Hamilton.

Several of the witnesses introduced by the State testified that they observed the commencement of the encounter, and saw appellant looking intently at Hamilton as the latter walked along with Holt; that appellant drew his pistol and fired the first shot, and that after appellant fired the second shot, Hamilton drew his pistol and advanced upon appellant, firing at him. Appellant, after firing all the loads in his pistol, turned and ran, Hamilton following until he sank down from a fatal wound which he had received from one of appellant's shots.

There is no direct testimony as to which of appellant's shots struck Hamilton except appellant's own testimony, and he said that it was the second shot he fired. Hamilton was shot in the breast, and the ball went through his body and made its exit in the back, near the shoulder-blade.

Appellant and other witnesses introduced by him testified that Hamilton drew his pistol and fired at appellant before the latter had made any demonstration, and that the first shot fired by appellant was after he had been fired upon by Hamilton.

Appellant proved certain communicated threats made by deceased, and also attacked the general reputation of deceased as a dangerous and turbulent man. The

State responded to this proof by introducing testimony showing that the reputation of deceased for peace and quietude was good.

The court permitted appellant to introduce several witnesses to prove threats against appellant on the part of deceased and instructed the jury that such proof should be considered for the purpose of determining who was the aggressor in the encounter, and also for the purpose of determining "whether or not the defendant acted in an honest belief that he was in danger of losing his own life, or receiving great bodily injury, at the time of the killing."

The court refused to permit witness May to testify concerning what appellant contends was a threat on the part of Hamilton towards appellant, and that ruling of the court is assigned as error. The statement of the witness was heard by the court in the absence of the jury and excluded from consideration of the jury. The testimony of the witness was that he had a conversation with Hamilton about a month before the fatal encounter between the latter and appellant, and the conversation was related by the witness as follows:

"Q. Now, Mr. May go ahead and tell what was said to you there by Mr. Hamilton. A. When he asked me, 'did I know Mr. Stoddard,' I told him I did, and he asked me had I heard they wasn't good friends, and I told him I had, and he asked me was Mr. Stoddard afraid of him, and I told him I didn't think so, and I said in a way he might be, and he says, 'In what way?' and I said, 'He is kind o' afraid you will take the drop on him.' 'Now,' I says, 'that is what several people told me at Colt,' but he says, 'You know me well enough to know that Arthur Hamilton wouldn't get behind a tree to get no man,' and he says, 'If I get Stoddard in the right kind of a crowd, I am going to show what there was to him.' Q. How long after that was it before they got into it? A. About a month. Q. He said if he ever got him in the right kind

of crowd, he was going to show you fellows what there was to him."

We are of the opinion that the court erred in excluding this testimony. There is no proof that this alleged threat was communicated to appellant, but, if the language used, under the circumstances, was insufficient to constitute a threat, it was, nevertheless, competent for the purpose of arriving at a conclusion as to who was the aggressor in the difficulty. The language used by deceased to the witness did not contain an express threat, in so many words, but the language was of such import that the jury might have concluded that it was intended as a threat. It was a question for the jury to determine what weight to give to the language, and to determine the degree of its intensity as an implied threat, thus shedding light upon the deceased's state of mind towards appellant at that time. The proper rule on this subject is stated in an enclyclopedia as follows:

"No particular words are necessary to convey a threat. Any language which shows this, either on its face or in connection with the circumstances under which it was spoken or written, and with the relations of the parties, is sufficient, though it consists merely of innuendoes and suggestions." 28 A. & E. Enc. of Law, 145.

This court, in *Brown* v. *State,* 55 Ark. 593, showing it to be in the mind of the court that a threat need not be in express language, said: "The declaration of the deceased which the defendant offered to prove by Mrs. Medlin was in the nature of a threat made by the deceased a few days before his death, and was competent evidence. In connection with the other threats admitted by the court the declaration referred to was a circumstance proper to be considered by the jury as tending to show that the deceased was the aggressor." The statement of deceased to witness May, as related by the latter, shows that it was intended as in the nature of a threat. The first inquiry of deceased was whether or not the witness was a friend of appellant's, and then he asked

whether or not appellant was afraid of him. When told that appellant was afraid that deceased might take advantage of him, he declared in effect that he would not ''get behind a tree to get no man,'' and that ''If I get Stoddard in the right kind of a crowd, I am going to show what there is to him.'' This clearly implied a threat to provoke some sort of difficulty with appellant—in other words, to test his mettle in an encounter, and to show to those present the extent of appellant's courage. The error in excluding this testimony must be treated as prejudicial, for we have no means of determining what effect it might have had on the minds of the jury. There was a sharp conflict in the testimony as to who was the aggressor, and, though other witnesses testified concerning threats, the excluded testimony of witness May might have turned the scales in appellant's favor.

Appellant was introduced as a witness in his own behalf, and he detailed the association between himself and deceased since they became acquainted, about two years before the killing occurred. He testified that he began working for deceased as bookkeeper, and later became the latter's tenant on a farm. He testified concerning the state of feeling between himself and deceased for several months prior to the killing, and stated, among other things, that his wife had informed him that the deceased had insulted her by making indecent proposals. This testimony was repeatedly offered in the course of appellant's examination by counsel, and in each instance the court excluded it. We can perceive no theory upon which this testimony was admissible, and we are of the opinion that the court properly excluded it. The fact that deceased had made indecent proposals to appellant's wife could not be established by hearsay testimony, and the offered testimony was purely hearsay. Neither the fact that deceased made such proposals, or that appellant received information that he had done so, afforded any excuse or justification for the homicide (*Fisher* v. *State,* 149 Ark. 48; *Flowers* v. *State,* 158 Ark. 295), and the

receipt of such information could not even be considered in mitigation unless it came so close in point of time to the commission of the offense as to arouse a sudden heat of passion which continued without let or hindrance down to the fatal encounter. *Flowers* v. *State, supra.* Counsel for appellant insist that this testimony comes within the rule announced by this court in *Prewitt* v. *State,* 150 Ark. 279. We do not think that the decision in that case has any bearing upon the question now under discussion. The testimony of a conversation between appellant's wife and the mother of deceased was held admissible for the purpose of corroborating the appellant in his statement that he had not made derogatory remarks concerning deceased's mother, as charged against him. No such question is presented in the present case.

After appellant had introduced testimony attacking the reputation of deceased, the State introduced a number of witnesses to prove that the reputation of deceased was good. All of the witnesses who testified on this subject stated that they had been personally acquainted with deceased, and knew his reputation in the neighborhood in which he lived, but on cross-examination some of them stated that they had never heard his reputation discussed. Counsel for appellant moved in each instance that the testimony be excluded, and the refusal of the court to do so is assigned as error. We do not think that the court erred in refusing to exclude this testimony because the witnesses said that they had not discussed the reputation of deceased with other persons. Each of the witnesses stated, on direct examination, that they were acquainted with deceased, and knew his reputation. This qualified them to testify on the subject. The fact that they admitted on cross-examination that they had not heard the reputation of deceased discussed by any one did not render the testimony incompetent, but merely went to its weight and to the credibility of the witnesses. There was therefore no error committed in this regard.

Each of the paragraphs of the court's charge to the jury was objected to, and exceptions duly saved. We have examined the instructions, and find no error in any of them except in No. 3, which reads as follows:

"You are instructed that, even though you may find that the deceased had made some threats against the defendant, and that these threats had been communicated to the defendant, still this would not justify the defendant in taking the life of the deceased, but can only be considered by you in determining who was the aggressor at the time the deceased was killed."

This instruction was erroneous in telling the jury that proof of threats could only be considered in determining who was the aggressor. In another instruction given immediately following this one, the court told the jury that such testimony could be considered, not only to determine who was the aggressor, but also to determine "whether or not the defendant acted under an honest belief that he was in danger of losing his own life or receiving great bodily injury at the time of the killing." The erroneous omission of this statement from instruction No. 3 may have resulted as a mere inadvertence, and, as the judgment is to be reversed on another ground, we need not determine whether or not the defect in instruction No. 3 would cause a reversal in the absence of a specific objection. We merely call attention to the defect now so that it will not occur in the next trial. .

Appellant requested seventeen instructions, all of which the court refused. The same instructions may not be asked in the next trial, and it is unnecessary to discuss them. There is one feature, however, which, we think, calls for discussion in view of the fact that the same question may arise in another trial. The court gave the following, among other, instructions at the request of the prosecuting attorney:

"No. 1. There has been some evidence introduced bearing upon the bad character of the deceased prior to the commission of the crime charged in the indictment

in this case; and in this connection you are instructed that you are to consider this evidence for the purpose of deter-mining whether or not deceased was making an attack upon the defendant at the time of the killing, or whether the defendant honestly believed, at the time, without fault or carelessness on his part, that the deceased was about to take his life or do him a great bodily injury."

"No. 6. You are instructed that the right of self-defense is founded solely on the principle of necessity; and, before the plea is available in this case, it must have appeared to the defendant, acting without fault or care-lessness on his part, not only that danger to him at the hands of the deceased was imminent, but that it was so pressing and urgent that, to save himself from immediate death or great bodily harm at the hands of the deceased, the killing of the deceased was necessary."

It will be observed that these instructions, particu-larly No. 6, stated in substance that the plea of self-defense is not available unless it appeared to the defend-ant, acting without fault or carelessness on his part, that the danger was so pressing or urgent that, to save him-self from immediate death or bodily harm, the killing was necessary. These instructions were correct as far as they went, but appellant was entitled to an instruction telling the jury affirmatively that, if the danger appeared to the defendant, acting without fault or carelessness, to be so pressing and urgent that the killing was neces-sary, and he honestly believed that it was so, he would be justified. Several instructions on this subject were asked by appellant but refused. One of them (No. 17) reads as follows:

"You are instructed that, to justify a killing in self-defense, it is not essential that it should appear to the jury to have been necessary, but, if the defendant believed there was a reasonably apparent necessity to kill to save himself, though to the jury there may not seem to have been any such necessity, and if in fact there was no such necessity, yet it is sufficient if the defendant honestly

thought, without fault or carelessness on his part, that the danger was so urgent and pressing that the killing was necessary to save his own life or to prevent great bodily injury—if you find that to the defendant there appeared such facts, then you will acquit him.''

That instruction was not accurate, and the court was therefore not bound to give it, because it contained the words, ''reasonably apparent.'' The thing that affords justification is that the necessity to kill appears to be real and not merely reasonably apparent. The necessity may not actually exist, but it must so appear to the accused acting without fault or carelessness, and he must honestly believe so before he is justified. There must be a belief on the part of the accused, honestly entertained, that there is a real necessity—not merely a belief that there is a reasonably apparent necessity. The distinction may seem technical, but the trial court in giving or refusing instructions has the right to refuse one which is not technically correct. We merely mentioned this to show that while the court was correct in refusing this particular instruction, the request for one on this subject should be granted. Other instructions on the subject are open to the same objection.

For the error indicated in refusing to admit the testimony of witness May, the judgment is reversed, and the cause remanded for a new trial.